STATE of Wisconsin, Plaintiff-Respondent,†

v.

Jason A. JONES, Defendant-Appellant-Petitioner.

Supreme Court

*No. 92–1316–CR. Oral argument November 30, 1994.—Decided May 2, 1995.*

(Also reported in 532 N.W.2d 79.)

†Motion for Reconsideration denied with Per Curiam issued June 29, 1995.

For the defendant-appellant-petitioner there was a brief by *Robert P. VanDeHey* and *Hoskins, Brown, Kalnins, McNamara & VanDeHey,* Lancaster and oral argument by *Robert P. VanDeHey.*

For the plaintiff-respondent the cause was argued by *William L. Gansner,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

DAY, J. This is a review of an unpublished decision of the court of appeals that affirmed a judgment of conviction of the circuit court for Grant County, Honorable John R. Wagner, judge. A jury found the defendant, Mr. Jason A. Jones, guilty of first-degree intentional homicide, sec. 940.01, Stats. 1991–92, and burglary, sec. 943.10(2)(a), Stats. 1991–92. Mr. Jones was sentenced to life in prison with a parole eligibility date of 2041 on the homicide count, and a consecutive twenty year prison term on the burglary count. Jones asserts that the trial court erred by refusing to suppress statements he argues were taken in violation of his fifth amendment privilege against self-incrimination and his sixth amendment right to counsel. Jones also asserts that the court of appeals erred by relying on a decision that was mandated after he committed his crime in upholding the trial court's refusal to allow an offered jury instruction on second degree intentional homicide. We find no error, and so affirm the decision of the court of appeals.

At about midnight on May 16, 1991, Jones, who at the time was seventeen years old, and Mr. Leonard Crary broke into the apartment of Mr. Gerald Szymanski and attacked him, repeatedly stabbing him and cutting his throat. After the attack, Mr. Szymanski managed to walk to a gas station before he collapsed and died.

At about 2:45 a.m. on May 17, 1991, the police notified Ms. Kim Mathews, Mr. Szymanski's daughter, of her father's death. An officer took Ms. Mathews across the street to the police station, where she made a telephone call. The officer was "bothered" because Ms. Mathews showed no signs of emotion upon being told of her father's death. Ms. Mathews returned home at about 3:00 a.m.

About 5:30 a.m., the officer returned to Ms. Mathews home with several other officers and received her permission to search her residence. The officers found Jones and Crary asleep in a bedroom, and Jones was told, at gunpoint, to remain in the living room of the home. The officers also found two knives—the murder weapons—and several items of blood stained clothing.

Deputy Jim Kopp of the Grant County Sheriff's Department asked Jones to accompany him to his squad car which was in front of Ms. Mathews house. Deputy Kopp told Jones that he was not under arrest and that he could return to the house if he wanted, but that he probably would be arrested by the end of the day. Deputy Kopp then advised Jones of his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966), and Jones signed a written waiver. The two talked for one hour, during which time Jones made no incriminating statements.

While in the squad car outside Ms. Mathew's residence, Jones requested the use of a rest room. Deputy Kopp drove Jones to the Fennimore Police Department, but before arriving at the station, Deputy Kopp stopped briefly outside Mr. Szymanski's residence.[1] When they arrived at the police department, Jones used the rest room, and afterwards Deputy Kopp continued the interview. He did not reread the *Miranda* warnings Jones had waived about one hour before. In this interview, Jones gave a statement that placed him at the scene of the murder, but he denied planning the murder or stabbing the victim. According to Jones' first statement which he signed at 8:47 a.m.:

---

[1] Deputy Kopp testified as follows about the reason for the stop at the victim's residence:

Q. Why did you stop there?

A. Because we were going to the police department and I couldn't get into the police department, I don't have a key, and the Chief of Police was there and I stopped and asked him if he could go in and unlock the police department and turn the computer on so I could use it.

Q. And he agreed to do that?

A. Yes.

Q. And you continued to the police department?

A. Yes.

Deputy Kopp also testified about the time involved:

Q. When you left the residence of Kim and Terry Matthews at 1275 9th Street with the defendant, by leaving the residence I mean leaving that area in your squad car, how long did it take you to get to the police department?

A. A minute, a minute and a half. It was under five minutes for sure.

We went, CC and I went up to the guy's house that died, I don't know his name . . .. On the way over, we discussed it and we were going to go into the house and take any money we could find along with VCRs, anything like that. We walked into the house . . . There was a door and CC opened the door and it must have been a bedroom, a dog started barking and a guy jumped up from a bed, CC at this time freaked out and reached out and stuck the guy with the knife, I could hear like blood squirting, I can't really describe the sound. It is something like when a pig has its head cut off . . .. I at no time stabbed the man . . .. I washed the knife off while CC was in the bathroom and the reason that I washed the knife off was so I could get rid of any evidence of the burglary or the stabbing.

After giving this statement, Jones was transported to the Grant County Jail.

Because Jones was seventeen, the District Attorney's office notified the Grant County Social Services Department of the arrest. A juvenile intake worker, Mr. Thomas Hughey, received notice that a juvenile was being held in the Grant County Jail at about 9:30 a.m., May 17, 1994. Mr. Hughey met with Jones at the jail and gave the following testimony about that meeting:

Q. What did you do in regard to the interview itself with the defendant?

A. I let Mr. Jones know that he had a right to an attorney and that right to an attorney included detention hearings that he would have for the court to determine whether there was reason to hold him in secure detention.

Q. Did Jason Jones at that time say anything concerning a lawyer?

A. He did say he had an attorney in Sauk County and I let him know that that may not be practical for the detention hearing as far as an attorney getting down here, but that if the attorney could not, he would have a right to have an attorney probably from the public defender's office at the detention hearing.

Q. Did he say anything more at that time?

A. No, he did not.

Q. What happened after that conversation was concluded?

A. After that conversation, Jason began asking me questions about what was likely to happen. I did let him know it was likely that we would seek to waive him into adult court. That the other questions such as what could happen to him would be better answered by an attorney.

On cross-examination, Mr. Hughey stated:

Q. How did the discussion concerning Sauk County and the Sauk County attorney come up?

A. When I let him know he had a right to an attorney, he said, "I already have got one." That he had one represent him in Sauk County in other matters.

Q. And so he felt that this attorney would be representing him regarding the Grant County matters?

A. I don't know what he thought.

Mr. Hughey later attempted to contact Jones to see if he had any questions about his rights. Again on cross-

examination, Mr. Hughey was asked about what he was thinking when making that call:

> Q. Did you have some reason to believe that Jason might have been confused about those issues?
>
> A. No, it was more an attempt on my part to make sure that, I guess, the I's were dotted and the T's were crossed.

After talking with Jones, at approximately 10:50 a.m., Mr. Hughey filed a Temporary Physical Custody Request form, Form J–103. Mr. Hughey then notified the Public Defender's Office that there was a juvenile in custody and that a Detention Hearing had been scheduled for 1:00 p.m.[2] The Assistant District Attorney requested that Mr. Hughey not give the Public Defender's Office the name of the juvenile, and not to contact the defendant's parents or the defendant's legal guardian, Sauk County. Shortly thereafter, Mr. Hughey told the Assistant District Attorney that he was obligated by law to inform the defendant's parents and his legal custodian, and the Assistant District Attorney told him to do so.

Upon learning of the Detention Hearing, the Public Defender's Office in Lancaster, Wisconsin appointed local counsel, attorney Mark Hoskins to represent Jones. Someone from Attorney Hoskins' office immediately advised jail personnel that no one was to interview the defendant. Grant County Sheriff's Captain Krohn knew of the instruction, but decided to

---

[2] Some time before 11:35 a.m., the District Attorney's request that the hearing be rescheduled for 4:00 p.m. because "they were still doing paper work, statements, whatever" was granted.

interview Jones anyway because jail personnel told him that Jones had not requested an attorney.

At the outset of the interview, Captain Krohn asked Jones if he had been informed of his constitutional rights, and Jones responded that he had. Captain Krohn then asked Jones if he understood that those same rights still applied. Jones said he did. Jones then made an incriminating statement which he signed at 12:07 p.m. That signed statement contains his admissions that he stabbed the victim and that he discussed the possibility of killing the victim prior to the assault. It reads in pertinent part:

> [T]he plan was to go and rob this gentleman's apartment. We discussed before leaving that if the plan didn't work we would kill the man. CC had a buck knife and I had a silver-handled knife. After we got to the apartment, the man jumped up out of the bed and got the knife away from CC. We both then jumped at the man. We were fighting for the knife. I had the man from the back with one arm around the neck and the other on top of his forehead. CC was underneath him. CC was trying to get the knife back away from him. The man's arm which was holding the knife came down and CC got stabbed in the arm. I reached in my pocket and opened the blade by pushing the knob on the blade and it came out. I then stabbed the man in the left side. I also stabbed the man in the back. I don't recall how many times. I also stabbed him on the front I believe once. After CC got the knife back, I went over to the dog to try to kill it.

Over the next few days, Deputy Kopp received messages from Jones that Jones wanted to speak to him. Deputy Kopp did not contact Mr. Hoskins or the District Attorney's Office prior to meeting with Jones,

Deputy Kopp testified that he did not interrogate Jones, but only took him into the interviewing room and listened while Jones talked. Jones was not given his *Miranda* rights before these interviews. Deputy Kopp obtained at least four other statements from Jones in these interviews.

Jones was waived into adult court, where the State alleged that Jones and Crary murdered the victim because they were asked to do so by Ms. Mathews or by the victim's son-in-law. Jones sought to introduce evidence that Mr. Szymanski had allegedly sexually assaulted Ms. Mathews and her daughter and had been convicted of sexually assaulting Ms. Mathew's sister-in-law. Jones also sought to introduce evidence of other crimes the victim had committed. In addition, Jones requested a jury instruction on second degree intentional homicide (formerly manslaughter/imperfect defense). The trial court did not admit the evidence of the victim's alleged crimes or criminal record and rejected the offered instruction.

A jury convicted Jones of first-degree intentional homicide contrary to sec. 940.01, Stats. 1991–92, and burglary contrary to sec. 943.10(2)(a), Stats. 1991–92. Jones appealed his conviction to the court of appeals asserting fifth and sixth amendment arguments, an improper refusal to permit the jury instruction, and two other arguments not before this court: unlawful search and seizure and erroneous exercise of sentencing discretion. The court of appeals issued a decision affirming the conviction, deciding all issues against Jones. *State v. Jones,* No. 92–1316–CR, unpublished opinion (Wis. Ct. App. Nov. 18, 1993). Jones petitioned for review which was granted on March 8, 1994.

■ This case presents both statutory and constitutional interpretation issues. These questions are reviewed without deference to the lower courts. *State v. P.G. Miron Const. Co., Inc.,* 181 Wis. 2d 1045, 1052, 512 N.W.2d 499 (1994). The case also presents several questions that require "application of constitutional principles to the facts as found." *State v. Woods,* 117 Wis. 2d 701, 715, 345 N.W.2d 457 (1984).[3] Those issues are questions of constitutional fact which must be independently determined by this Court. *Id.* at 715.

*FIFTH AMENDMENT RIGHT TO COUNSEL ISSUES*

■ It is clear under the well known decision in *Miranda* and the many decisions that have followed it that if a suspect requests an attorney during custodial interrogation, one must be provided before continuing any questioning. *See Miranda v. Arizona,* 384 U.S. at 474; *Edwards v. Arizona,* 451 U.S. 477, 484–85 (1981).

---

[3] The dissent states that this case was "overruled sub nom" by *Woods v. Clusen,* 794 F.2d 293 (7th Cir. 1986). As explained *infra* p. 101, *Clusen* was a habeas case connected with *Woods.* "The writ of *habeas corpus* is *not* a proceeding in the original criminal prosecution but an *independent* civil suit" that "does *not* afford 'direct' appellate review but only 'collateral' review of the legality of criminal judgments." James S. Liebman & Randy Hertz, 1 *Federal Habeas Corpus Practice and Procedure,* sec. 2.2 at 6–7 (2d ed. 1994) (footnotes omitted). Since the *habeas corpus* case was a collateral, independent civil suit in a federal court other than the United States Supreme Court, it cannot have "overruled" the decision by this court in a different, criminal suit.

Jones only mention of an attorney was his statement, "I already got one," referring to an attorney in Sauk County who had represented him in another matter. Jones argues that *State v. Lampe,* 119 Wis. 2d 206, 349 N.W.2d 677 (1984), adopted a "bright line" rule that any reference to an attorney requires the police to cease all questioning. That interpretation of *Lampe* was rejected in *State v. Walkowiak,* 183 Wis. 2d 478, 515 N.W.2d 863 (1994). There this Court stated that the terms "lawyer" and "attorney" do not have "talismanic qualities." *Id.* at 487.

At oral argument, Jones' counsel argued that Jones' statement, "was not an ambiguous request for an attorney, this *was* a *request* for an attorney, there is nothing ambiguous about it." In *Smith v. Illinois,* 469 U.S. 91 (1984), the United States Supreme Court stated, "[w]here nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." *Id.* at 98. However, Jones' statement simply was not a request for counsel. A request for counsel is a statement in which the person, "express[es] his desire to deal with the police only through counsel." *Edwards,* 451 U.S. at 484. Jones' mention of a lawyer in another county does not even arguably express that desire. Therefore, we conclude that Jones' statement was not a request for an attorney.

Also at oral argument, Jones' counsel stated, "I did in my initial argument mention the *Walkowiak* case which said, if there is an ambiguity, it has to be cleared up, and I think that in this particular case if there was an ambiguity the state had the burden to pick it up . . . .." In *Walkowiak,* this Court held that a suspect's statement, "Do you think I need an attorney?" necessitated a

response from the questioning officer because it showed that the "suspect has uncertainty." *Id.* at 486.[4] Such a statement was said to be an equivocal question or reference to an attorney. *Id.* Jones' statement here shows no uncertainty. In fact, his statements and actions show that Jones knew of his right to an attorney and chose to go on without one present. Further, courts throughout the country are almost unanimous in holding that a suspect's reference to an attorney who

---

[4] *Walkowiak* relied exclusively on the United States Constitution and federal case law to reach its decision. One month after this Court's decision in *Walkowiak,* the United States Supreme Court in *Davis v. U.S.,* 114 S.Ct. 2350 (1994), rejected the "clarify" approach, overruling the federal cases cited in *Walkowiak.* The United States Supreme Court listed obstacles to efficient law enforcement and the "difficult judgment calls" required of officers "with the threat of suppression if they guess wrong" as the rationale for overruling those cases. *Id.* at 2356–57. In place of the "clarify" approach, the Court held that the suspect "must unambiguously request counsel." *Id.* at 2355. The United States Supreme Court summarized its decision as follows:

> To recapitulate: We held in *Miranda* that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in *Edwards* that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect might want a lawyer. Unless the suspect actually requests an attorney, questioning may continue.

*Id.* at 2356–57.

The court of appeals, relying on *Davis,* has already reached a result contrary to *Walkowiak. State v. Long,* 190 Wis. 2d 387, 526 NW2d 826 (Ct. App. 1994) (petition for review denied as untimely filed).

had previously or is currently representing him in another matter is not a request for counsel.[5]

---

[5] *See Delap v. Dugger,* 890 F.2d 285, 294 (11th Cir. 1989), *cert denied,* 496 U.S. 929 (1990) (defendant's statement that he was represented by counsel in an unrelated matter did not constitute an equivocal request for counsel); *Commonwealth v. Davis,* 565 A.2d 458, 459–60 (Pa. Super. 1989) (defendant's statement "I have a lawyer." not an invocation of his fifth amendment right to counsel when made in response to a statement that he had a right to representation at his preliminary arraignment); *Doyle v. State,* 460 So. 2d 353, 356 (Fla. 1984) (defendant's remark that the attorney who had represented him in an earlier matter was currently out of town not enough to invoke his fifth amendment right to counsel); *State v. Thompson,* 307 S.E.2d 838, 840–41 (N.C.App. 1983) (defendant's statement that a particular lawyer had represented him in the past did not invoke right to have counsel present at questioning where the reference was to representation at trial, not at questioning); *Vail v. State,* 536 N.E.2d 302, 303 (Ind. App. 3 Dist. 1989) (defendant's statement in response to the prospect of going to court on the charges that "if I have to do it, I'm going to have to get Langston for my lawyer again." not an attempt to invoke his right to remain silent or to consult with an attorney before proceeding); *State v. Cardona,* 632 A.2d 845, 847, 849 (N.J. Super A.D. 1993) (reference to attorney who "stole" money from the defendant in a past representation together with claimed poverty not an ambiguous request for counsel where defendant had already given a voluntary statement and had been read his *Miranda* rights on multiple occasions); *State v. Ducharme,* 601 A.2d 937, 945 (R.I. 1991) (defendant's claim that he had an attorney-client relationship with an attorney not probative as to whether he requested the assistance of counsel in a particular matter), *People v. Coleman,* 586 N.E.2d 270, 279 (Ill.App. 1 Dist. 1991), *affirmed in part and reversed in part on other grounds,* 617 N.E.2d 1200 (Ill. 1993) (defendant's acceptance of counsel on unrelated charges did not also operate to invoke a protection against interrogation); *but see State v.*

We examine not only the words Jones used. We also look at the circumstances leading up to the statement and the context of the actual statement. Here those circumstances demonstrate that Jones' statement was not an equivocal reference to counsel. Jones made the statement after being advised of his rights for the second time, and after he had already given one incriminating statement to the authorities. Further, the statement was not made in the coercive environment of a police interrogation, but rather was made to a juvenile intake worker while the two were discussing not the fifth amendment right to have an attorney present at questioning, but the sixth amendment right to have one at his detention hearing. Finally, minutes later Jones expressed his willingness to answer further questions after he was reminded of his constitutional rights and again stated that he remembered and waived those rights.

Jones also argues that this Court must find his statement about his lawyer in Sauk County to be an invocation of his right to have an attorney present during questioning because that was the way that Mr. Hughey, the juvenile intake worker, interpreted it. Jones' interpretation of Mr. Hughey's thought process is not supported by the record. Mr. Hughey did contact the Public Defender's Office after his meeting with Jones. However, he did not inform the Public

*Christopherson,* 793 P. 2d 944, 947 (Utah App. 1990) (reference to attorney who had been appointed to represent the defendant in a separate and pending matter found to be an "arguably equivocal" reference because the defendant said that he had not yet spoken with him, but statement admissible because police followed stop and clarify approach to ambiguous references to counsel).

Defender's Office of the name of the individual who the Detention Hearing concerned, but only told them the time of the Detention Hearing. Further, when asked the direct question of whether Jones felt that the Sauk County attorney would be representing him, Mr. Hughey responded, "I don't know what he thought." Finally, the fact that Mr. Hughey later attempted to contact Jones shows that he did not believe that Jones had requested counsel. The evidence thus demonstrates beyond a reasonable doubt that Mr. Hughey contacted the Public Defender's Office to assure Jones' statutory right to an attorney at the Detention Hearing was honored, not because he thought Jones had invoked his fifth amendment rights.

Jones did not personally invoke his fifth amendment right to an attorney prior to giving the statement he signed at 12:07 p.m. However, Captain Krohn knew that Attorney Hoskins had been appointed for Jones and that he had asked that no one interview Jones until he arrived. Jones argues that this knowledge was enough to invoke his fifth amendment rights.

Such a claim was rejected in *Hanson*, 136 Wis. 2d at 213. There, the defendant's parents asked an attorney to represent their son. *Id.* at 203. That attorney told the police that no one was to question the defendant unless he was present, but the police interviewed the defendant anyway. *Id.* at 204–05. This Court held that, "Since the right to counsel and the right to remain silent are given by the constitution to the defendant, he alone can exercise those rights." *Id.* at 213.

■ Since Jones never invoked his fifth amendment right to counsel, the statement he signed at 12:07 p.m. is admissible if the State can prove beyond a reasonable doubt that Jones knowingly, intelligently and

voluntarily waived his *Miranda* rights. *Woods,* 117 Wis. 2d at 722. Jones argues that there was no valid waiver because sec. 48.23(1)(a), Stats. 1991–92,[6] requires such a waiver to be made in court. Because that section deals with a juvenile's right to counsel, not during questioning, but during a detention hearing, and because Jones' right to counsel under the section had not yet attached (see *infra* p. 104–105), Jones' waiver did not need to be approved by the court.

Jones argues that his waiver was not knowing, voluntary and intelligent because Captain Krohn did not re-read the *Miranda* warnings prior to beginning the interrogation and because Jones was not informed of Attorney Hoskin's presence. These arguments are contrary to well established law.

In *State v. Fillyaw,* 104 Wis. 2d 700, 725, 312 N.W.2d 795 (1981), *cert denied,* 455 U.S. 1026 (1982), this Court held that "[i]t is not necessary to repeatedly recite the *Miranda* warnings during an investigation of the same person for the same crime." Here, Jones was read his *Miranda* rights once by the police, once by Mr. Hughey, and he was reminded that they still applied just prior to giving his statement. This was sufficient to satisfy the *Miranda* requirement that Jones be apprised of his rights.

---

[6] Section 48.23(1)(a), Stats. (1991–92), provides in part:

**48.23 Right to counsel. (1)** RIGHT OF CHILDREN TO LEGAL REPRESENTATION. Children subject to proceedings under this chapter shall be afforded legal representation as follows:

(a) Any child alleged to be delinquent under s. 48.12 or held in a secure detention facility shall be represented by counsel at all stages of the proceedings, but a child 15 years of age or older may waive counsel if the court is satisfied that the waiver is knowingly and voluntarily made and the court accepts the waiver. . . .

Similarly, in *Hanson* this Court held that the fifth amendment "does not require the police to advise the suspect of the immediate availability of a particular attorney." *Hanson,* 136 Wis. 2d at 208. The reasoning the *Hanson* court quoted from a United States Supreme Court opinion is equally applicable in the case before us:

> Because, as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process, a rule requiring the police to inform the suspect of an attorney's efforts to contact him would contribute to the protection of the Fifth Amendment privilege only incidentally, if at all. This minimal benefit, however, would come at a substantial cost to society's legitimate and substantial interest in securing admissions of guilt.

*Id.* at 210 (*quoting Moran v. Burbine,* 475 U.S. 412, 427 (1986)). Jones saw two attorneys within a minute or so after Captain Krohn completed his questioning and told Jones there were two attorneys "out there that were there to see him." However, this does not cast doubt on the knowing and voluntary nature of his prior waiver. As this Court stated in *Hanson,* "[a]lthough a suspect who was ready to waive his rights might change his mind when told an attorney was waiting to see him, the critical factor would be the convenience of seeing the attorney, not the intelligent perceived need for legal counsel." *Id.* at 212.

We agree with the *Moran* court that:

> reading *Miranda* to require the police in each instance to inform a suspect of an attorney's efforts to reach him would work a substantial and, we think, inappropriate shift in the subtle balance

100

struck in that decision [between] society's compelling interest in finding, convicting, and punishing those who violate the law . . . [and] constitutionally impermissible compulsion.

*Moran,* 475 U.S. at 426 (citations omitted). Due to our general policy of following the United States Supreme Court's decisions on fifth amendment issues, we conclude it is for the legislature and not this Court to decide whether to "adopt[ ] different requirements for the conduct of [state] employees and officials as a matter of state law." *Moran,* 475 U.S. at 428.

Jones also argues that the holdings in *Fillyaw* and *Hanson* should not apply to him because both involved adult suspects. Further, Jones notes the conduct of the authorities: the detour past the scene of the murder, the Assistant District Attorney's request that Jones' parents and legal guardian not be notified and refusing to allow Mr. Hughey to speak with him when he phoned the jail. Jones contends that while one may be able to obtain a knowing, voluntary and intelligent waiver from an adult under these circumstances, one cannot be obtained from a juvenile. *See Woods v. Clusen,* 794 F.2d 293, 298 (7th Cir. 1986) (habeas corpus case disagreeing with this Court's conclusion that, under the facts of the case in *Woods,* a juvenile's confession was voluntary). We disagree.

Since Jones was a juvenile when he gave his statement, "the greatest care must be taken to assure that the admission was voluntary." *In re Gault,* 387 U.S. 1, 55 (1967). To determine whether a juvenile's waiver was knowing and voluntary, we examine the totality of the circumstances, including the "juvenile's age, experience, education, background, intelligence, and (inquiry) into whether he has the capacity to under-

stand the warnings given, the nature of the Fifth amendment rights, and the consequences of waiving those rights." *Clusen,* 794 F.2d at 296 (*quoting Fare v. Michael C.,* 442 U.S. 707, 725 (1979)).

There is ample evidence in the record to show beyond a reasonable doubt that Jones' waiver was knowing, voluntary and intelligent. First, Jones was less than ten months away from his eighteenth birthday when he committed the crime. Thus, his claim that the rulings in *Fillyaw* and *Hanson* should not apply to him because he is a juvenile is not persuasive. Further, as stated by the trial judge with reference to the presentence report the record shows that Jones had extensive contact with law enforcement officials in investigating several matters while he was a juvenile as well as during placements in various juvenile facilities. In contrast, the court in *Clusen* specifically cited the fact that Woods had no prior criminal record and no serious previous contact with the criminal justice system as factors that made his confession involuntary. *Clusen,* 794 F.2d at 297. Finally, Jones demonstrated his capacity to understand the warnings and the consequences of waiving his rights when he asked questions of Mr. Hughey, was told that some of them would be better answered by an attorney, and decided not to request one.

Jones other claims about the circumstances of the interrogations are likewise without merit. The momentary stop at the murder site four hours prior to the incriminating statement Jones seeks to suppress, as explained *supra* n.1, simply could not have been so emotionally traumatic as to have taken away Jones capacity to understand and exercise his fifth amend-

ment rights. The improper request made by the Assistant District Attorney and not allowing Mr. Hughey to speak with Jones did not affect Jones. The Assistant District Attorney conformed his conduct to the law immediately upon being informed of what that law was, and even if he had not, his actions could not have influenced Jones' decisions as Jones had no knowledge of them. Similarly, Jones could not have been influenced by the attempted contact by Mr. Hughey because he did not know about it prior to making his statement. Again this case presents facts that contrast sharply to those in *Clusen.* There two sets of police officers continued to question Woods despite his remaining silent for over one hour, "lied to Woods" about evidence tying him to the crime, and confronted him with graphic pictures of the murder scene. *Clusen,* 794 F.2d at 297.

■

We also find no error in admitting the conversations Jones had with Deputy Kopp during the days after he made his initial statements. In *Edwards,* the United States Supreme Court held that a suspect may, after asserting his fifth amendment rights, waive them by initiating "further communication, exchanges, or conversations with the police." *Edwards,* 451 U.S. at 484–85. The United States Supreme Court extended the *Edwards* analysis to sixth amendment cases in *Michigan v. Jackson,* 475 U.S. 625, 636 (1986).

Here there is no doubt that Jones initiated the meetings with Deputy Kopp. Jones on several occasions left messages asking Deputy Kopp to come talk to him. Deputy Kopp on at least four occasions answered Jones' requests by going to the jail and listening to Jones talk. As the Supreme Court stated in *Edwards,* "[h]ad Edwards initiated the meeting . . . nothing in the

Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." *Edwards,* 451 U.S. at 485. Deputy Kopp was not required to re-read Jones his *Miranda* rights prior to these conversations. *Fillyaw,* 104 Wis. 2d at 725. Defendant claims the record arguably shows that Deputy Kopp did more than just listen, however Jones does not cite any specific statement or question that would rise to the level of interrogation, hence his statements are admissible. *Edwards,* 451 U.S. at 486 n.9.

### *STATUTORY / SIXTH AMENDMENT RIGHT TO COUNSEL*

Section 48.23(1)(a), Stats., provides in relevant part, "Any child alleged to be delinquent under s. 48.12 or held in a secure detention facility shall be represented by counsel at all stages of the proceedings . . ." The parent, guardian, or legal custodian must also be notified of the child's right to counsel. Section 48.20(8), Stats. 1991–92.[7]

In *Woods,* this Court held that "neither the temporary custody order that [the juvenile intake worker] signed, nor the custodial interrogation of Woods, were 'proceedings' within the meaning of sec. 48.23(1)(a), Stats., for which counsel was required." *Woods,* 117 Wis. 2d at 736. Instead, "the first proceeding at which [a juvenile] would have been entitled to counsel under sec. 48.23(1), Stats., was a court hearing under sec.

---

[7] Section 48.20(8), Stats. 1991–92, provides in part:

**48.20 Release or delivery from custody . . . .. (8)** . . . The parent, guardian and legal custodian shall also be notified of . . . the right to counsel under s. 48.23 regardless of ability to pay . . . ..

48.21." *Id.* at 737. The hearing under sec. 48.21, Stats.,[8] had not taken place at the time Jones signed his statement, thus his statutory right to counsel had not yet attached.

Similarly, Jones' sixth and fourteenth amendment rights to counsel had not attached prior to the incriminating statement he signed at 12:07 p.m. In *Kirby v. Illinois,* 406 U.S. 682, 688 (1972), the United States Supreme Court held that the sixth amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against the defendant. In Woods, this Court held that "the analog to the 'commitment to prosecute' cited in *Kirby* is the filing of a delinquency petition under sec. 48.25." *Woods,* 117 Wis. 2d at 738. At the time Jones gave his statement neither a delinquency petition under sec. 48.25, Stats.,[9] nor a petition for waiver of jurisdiction for criminal proceedings under 48.18, Stats.,[10] had

---

[8] Section 48.21, Stats. 1991–92 provides for a delinquency hearing to determine if a juvenile who has been taken into custody can be detained, and provides in part:

**48.21 Hearing for child in custody. (1)** HEARING, WHEN HELD. (a) If a child who has been taken into custody is not released under s. 48.20, a hearing to determine whether the child shall continue to be held in custody under the criteria of ss. 48.205 to 48.209 shall be conducted by the judge or juvenile court commissioner within 24 hours . . ..

[9] Section 48.25, Stats. (1991–92), provides in part:

**48.25 Petition: authorization to file. (1)** A petition initiating proceedings under this chapter shall be signed by a person who has knowledge of the facts alleged . . ..

[10] Section 48.18, Stats. (1991–92), provides in part:

**48.18 Jurisdiction for criminal proceedings for children 14 or older; waiver hearing. (1)** If a child is alleged to have

---

been filed, thus his sixth amendment right to counsel had not yet attached.

Jones argues that even if a juvenile's right to counsel does not attach until the sec. 48.21 hearing, for that right to be adequately protected, counsel must be allowed access to the juvenile prior to the hearing in order to prepare to examine and cross-examine witnesses at the hearing. Jones continues by stating that this means that Attorney Hoskins should have been allowed immediate access to Jones. While a juvenile's sixth and fourteenth amendment rights to counsel would be violated if he were forced to proceed with a sec. 48.21 hearing without having adequate time to consult with his attorney, this does not mean that police must cease their investigation immediately when the attorney arrives. Rather, at most it means that law enforcement officials must allow the attorney an adequate opportunity to see and consult with the juvenile prior to the hearing. Jones does not allege that he did not have adequate time to consult with Attorney Hoskins prior to the detention hearing, and so Jones sixth and fourteenth amendment rights to counsel were not violated by delaying Attorney Hoskin's initial contact with Jones.

## *DUE PROCESS ISSUE*

In rejecting Jones' appeal of the trial court's ruling that he was not entitled to a jury instruction on the

violated s. 940.01 or 940.02 on or after his or her 14th birthday . . . the child or district attorney may apply to the court to waive its jurisdiction under this chapter.

(2) The waiver hearing shall be brought on by filing a petition alleging delinquency drafted under s. 48.255 and a petition for waiver of jurisdiction which shall contain a brief statement of the facts supporting the request for waiver. . . .

lesser offense of second degree intentional homicide, the court of appeals relied on this Court's decision in *State v. Camacho,* 176 Wis. 2d 860, 501 N.W.2d 380 (1993). In *Camacho,* this Court held that imperfect self-defense manslaughter under sec. 940.05, Stats. 1985–86[11] (now second degree intentional homicide under sec. 940.01(2)(b), Stats. 1991–92)[12] includes an objective element. That objective element requires the defendant to show a reasonable belief that he was preventing or terminating an unlawful interference with his person, or, as in this case, interference with "another." *Camacho,* 176 Wis. 2d at 865; sec. 940.01(2)(b), Stats. 1991–92. Jones claims that this Court's decision in *Camacho* removed a defense that was available at the time he committed his crime, and so cannot be applied to him without violating his right to due process. We conclude that Jones' due process rights were not violated because he had fair warning of the objective element when he committed his crime.

[11] Section 940.05, Stats. 1985–86 provided in part:

**940.05 Manslaughter.** Whoever causes the death of another human being under any of the following circumstances is guilty of a Class C felony: . . .. **(2)** Unnecessarily, in the exercise of his privilege of self-defense or defense of others or the privilege to prevent or terminate the commission of a felony;

[12] Section 940.01(2)(b), Stats. 1991–92, provides in part:

**940.01 First-degree intentional homicide . . .. (2)** MITIGAT-ING CIRCUMSTANCES. The following are affirmative defenses to prosecution under this section which mitigate the offense to 2nd-degree intentional homicide under s. 940.05: . . . (b) *Unnecessary defensive force.* Death was caused because the actor believed he or she or another was in imminent danger of death or great bodily harm and that the force used was necessary to defend the endangered person, if either belief was unreasonable.

The principles underlying the Ex Post Facto Clause "apply to judicial pronouncements as well as to legislative acts." *State v. Kurzawa,* 180 Wis. 2d 502, 510–11, 509 N.W.2d 712, *cert denied,* 114 S.Ct. 2712 (1994). "[T]he notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties—is fundamental to our concept of constitutional liberty." *Marks v. United States,* 430 U.S. 188, 191–92 (1977). Fair warning is not given, and a due process violation occurs, when a new judicial pronouncement "criminalizes conduct that was innocent when committed, increases the penalty for conduct after its commission, or removes a defense that was available at the time the act was committed." *Kurzawa,* 180 Wis. 2d at 513.

In *Camacho,* this Court held that the objective element could be traced to the plain language of the statute. *Camacho,* 176 Wis. 2d at 871–72. In reaching that holding, this Court noted that this Court had never rejected an objective element. *Id.* at 877. This Court went on to explain that, "[T]he 1987 revisions of the Criminal Code did not alter the crime of imperfect self-defense manslaughter. . . . [T]he crime of imperfect self-defense *still* consists of an objective threshold element and two subjective elements." *Id.* at 882–83 (emphasis added).

*Camacho* thus did not change settled law or take away a defense that existed at the time Jones committed his crime. As such, the trial judge in *Camacho* correctly interpreted the law when he did not give the uniform instruction that did not contain the objective element required by statute. Similarly, by refusing to give the offered instruction, the circuit court in this

case accurately interpreted the law as it existed at the time.

Jones argues that *Camacho* did in fact change the law, and this is shown by the fact that the court found it necessary to overrule the decision reached by the court of appeals in *State v. Harp,* 150 Wis. 2d 861, 443 N.W.2d 38 (Ct. App. 1989). *Camacho,* 176 Wis. 2d at 881–82. However, the statement of the elements of imperfect self-defense in Harp which this Court over-ruled was only dicta in that case. Further, at the time Jones committed his crime, the continued validity of that dicta was already in serious question.

In a decision which was handed down one year after *Harp* and one year prior to Jones' crime, this Court held that a defendant was not entitled to a con-viction of imperfect self-defense manslaughter even though the defendant possessed an actual belief, caused by mental delusions and paranoia, regarding an unlawful interference with his person. *State v. Seifert,* 155 Wis. 2d 53, 68, 454 N.W.2d 346 (1990). One mem-ber of this Court stated that this decision could be interpreted as holding that "the crime of attempted imperfect self-defense manslaughter encompasses an objective element." *Id.* at 72 (Abrahamson, J. dissent-ing) (also cited in *Camacho,* 176 Wis. 2d at 881). Therefore, the *Camacho* decision, especially after *Seifert,* was not "an unforeseeable judicial enlargement of a criminal statute," and so did not "deprive the defen-dant of the fair warning to which the Constitution entitles him." *Bouie v. City of Columbia,* 378 U.S. 347, 353–54 (1964).

The *Camacho* decision did not create the kind of " 'clear break' in the law . . . [which] may not be applied retroactively to criminal defendants' detriment."

*United States v. Burnom,* 27 F.3d 283, 284 (7th Cir. 1994) *(citing Marks,* 430 U.S. at 196). It did not create a break in the law at all. It only made explicit that which was implicit in this Court's prior decisions. As such, application of *Camacho* to Jones' case does not violate his due process rights.

We hold that the court of appeals correctly concluded that the actions of the police did not violate Jones' right to counsel under the fifth nor under the sixth amendment, and did not violate his statutory right to an attorney. We also hold that Jones' due process rights were not violated by refusing to allow the offered jury instruction.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. *(dissenting).* I write separately to clarify two issues: (1) what circumstances trigger a suspect's waiver of federal constitutional rights to remain silent and to counsel, and (2) under what circumstances does a juvenile suspect have a statutory right to counsel.

In *State v. Walkowiak,* 183 Wis. 2d 478, 515 N.W.2d 863 (1994), the court ruled that when a suspect subject to custodial interrogation makes *an ambiguous request for a lawyer* the law enforcement officers must stop their questioning and clarify whether the suspect is requesting counsel under the Fifth Amendment. One month later, the United States Supreme Court, faced with the same issue of deciding the obligations of law enforcement officers when a suspect ambiguously requests counsel, decided the issue differently. In *Davis v. United States,* 114 S. Ct. 2350 (1994), the Court determined that a suspect's federal constitu-

tional right to counsel is triggered only by *"an unambiguous request for a lawyer."* The Supremacy Clause dictates that the *Davis* interpretation of the federal constitution is binding on all courts of this state. Thus, although the majority neglects to acknowledge it, *Walkowiak* has been superseded by *Davis.*[1]

The effect under the Wisconsin constitution of a suspect's ambiguous request for counsel has not been determined by this court. The state constitutional issue was not raised or addressed in *Walkowiak* and is not raised or addressed in the present case.

While the majority addresses the issue of whether Jones made an ambiguous request for an attorney, this issue is of no significance under *Davis,* and the majority's discussion blurs the real question before the court. The majority should focus on whether Jones made an unambiguous request for an attorney. Adhering to *Davis,* I conclude that by no stretch of the English language or the circumstances of this case can it be said that Jones unambiguously requested an attorney. I therefore conclude that Jones' federal constitutional right to counsel was not violated.

Nonetheless, the court must look further to determine whether Jones, a juvenile, had a right to counsel under the Wisconsin statutes. Section 48.23(1)(a), Stats. 1991–92, requires that counsel be provided for juveniles in certain proceedings.[2]

---

[1] *State v. Long,* 190 Wis. 2d 387, 526 N.W.2d 826 (Ct. App. 1994) (relying on *Davis*).

[2] Section 48.13(1)(a), Stats. 1993–94, provides:

**"Right to counsel. (1)** Right of children to legal representation. Children subject to proceedings under this chapter shall be afforded legal representation as follows:

(a) Any child alleged to be delinquent under s. 48.12 or held in a secure detention facility shall be represented by counsel at all stages of the proceedings, but a child 15 years of age or older may

The following are the relevant facts needed to determine Jones' statutory right to counsel. A juvenile intake worker at the jail notified the public defender's office at about 10:50 a.m. that Jones would be subject to a juvenile detention hearing scheduled for 1:00 p.m. that day.[3]

An attorney appointed by the state public defender's office to represent Jones telephoned the jail to instruct that Jones not be interviewed. The police captain, aware of the attorney's request, nevertheless questioned Jones. During the interview, both Jones' counsel appointed by the public defender's office and a staff attorney from the public defender's office arrived at the jail to speak with Jones. The police captain, informed of the attorneys' presence, did not tell Jones that two attorneys appointed by the state to represent him were waiting to assist him.[4] Instead, the captain resumed his questioning of Jones until he elicited a confession at about 12:07 p.m.[5] Directly after Jones

waive counsel if the court is satisfied that the waiver is knowingly and voluntarily made and the court accepts the waiver. If the waiver is accepted, the court may not transfer legal custody of the child to the department for placement in a secured correctional facility or transfer jurisdiction over the child to adult court."

[3] At about 11:00 a.m., the district attorney spoke with the juvenile intake worker and indicated that he would need to postpone the detention hearing. The district attorney asked the intake worker to delay advising the public defender's office of the schedule change until 12:55 p.m.

[4] Nor was the juvenile intake worker, who attempted to reach Jones at about this time, able to see Jones.

[5] When the captain was informed that an attorney instructed jail personnel not to interview Jones, he telephoned a district attorney. (20:48, 22:107) The district attorney apparently informed the captain that he was under no obligation to heed the attorney's request because Jones had not specifically

signed the confession that the captain drafted, the captain asked Jones if he would like to see an attorney. Jones indicated that he would and the captain allowed him to confer with counsel moments later.

The Wisconsin legislature has determined that juveniles taken into custody shall be released as soon as possible. Section 48.20(1). The legislature has also resolved that juveniles facing detention hearings shall be represented by counsel. Sections 48.21, 48.23(1)(a), Stats. 1991–92; *State v. Woods,* 117 Wis. 2d 701, 736, 345 N.W.2d 457 (1984) overruled *sub nom., Woods v. Clusen,* 794 F.2d 293 (7th Cir. 1986); majority opinion at 104–105. The numerous subsections of sec. 48.23 requiring counsel and limiting waiver thereof evidence the legislature's intent that juveniles be represented. The rule of *State v. Woods,* 117 Wis. 2d 701, 345 N.W.2d 457 (1984), that sec. 48.23 does not grant a juvenile the right to counsel during a custodial interrogation, does not govern this case. *Woods* did not involve attempts by the juvenile's attorney to contact him during the custodial interrogation.

The majority also relies on *State v. Hanson,* 136 Wis. 2d 195, 401 N.W.2d 771 (1987), to ignore counsels' request to cease the interrogation and to consult with Jones. In *Hanson,* the court determined that police officers are not obligated to inform an adult suspect when an attorney is present to lend assistance. *Hanson,* in turn, echoes the rule established in *Moran v. Burbine,* 475 U.S. 412 (1986). Although the *Moran* Court concluded that the Fifth Amendment does not

---

requested counsel nor had the court appointed counsel. The captain testified that he failed to determine if the attorney who had made the request was acting as Jones' counsel and he later refused to inform Jones of the attorneys' presence because of his conversation with the district attorney. (22:107)

require police officers to inform an adult suspect of an attorney's attempted contacts, the Court invited states to adopt different standards for police conduct as a matter of state law. A number of states have opted to do so.[6] Despite Wisconsin's failure to alter the *Moran* rule, nothing in *Woods, Hanson,* or *Moran* authorizes police to ignore an attorney's request to confer with a juvenile suspect who is subject to a detention hearing.

I conclude that in keeping with the statute granting a juvenile the right to counsel during a detention hearing, this court should require law enforcement officers to inform a juvenile in custody when an attor-

---

[6] Several states have determined that a suspect should be informed of an attorney's attempted communications with the suspect and that the failure to do so is considered in determining whether the suspect made a knowing, voluntary and intelligent waiver of the right to counsel. *Haliburton v. State,* 514 So. 2d 1088 (Fla. 1987) (concluding that a suspect's state constitutional right to due process was violated when police refused to permit an attorney hired by the suspect's sister to confer with the suspect) *cert. denied, 501 U.S. 1259 (1991); State v. Stoddard, 537 A.2d 446 (Conn. 1988); Bryan v. State, 571 A.2d 170 (Del. 1990); People v. McCauley, 645 N.E.2d 923 (Ill. 1994), reh'g denied; West v. Commonwealth, 887 S.W.2d 338 (Ky. 1994); People v. Wright, 490 N.W.2d 351 (Mich. 1992); State v. Reed, 627 A.2d 630 (N.J. 1993); Roeder v. State, 768 S.W.2d 745 (Ct. App. Tex. 1988).*

Jurisdictions adhering to *Burbine* include *Aultman v. State,* 621 So. 2d 353 (Ala. Cr. App. 1992), *cert. denied* 114 S. Ct. 407 (1993); *Mitchell v. State,* 816 S.W.2d 566 (Ark. 1991); *People v. Page,* 1995 WL 82952 (Ct. App. Colo. 1995) (not yet released for publication in the permanent law reports); *Harvey v. State,* 529 So.2d 1083 (Fla. 1988) (distinguishing *Haliburton* on the grounds that the lawyer who was refused access to the suspect was not specifically summoned) *cert. denied,* 489 U.S. 1040 (1989); *State v. Earls,* 805 P.2d 211 (Wash. 1991).

ney is immediately available to consult with the juvenile before the detention hearing. *See Hanson,* 136 Wis. 2d at 219 (Abrahamson, J. dissenting) (adult suspect).

While I am aware of and give considerable weight to the needs of law enforcement officers, criminal investigations and public safety, I conclude that this court demeans the juvenile's statutory right to counsel by giving its seal of approval to conduct that prevents a juvenile suspect from conferring with counsel before a detention hearing, when counsel is at the jail requesting to see the suspect.

For the reasons set forth, I dissent.

I am authorized to state that Chief Justice NATHAN S. HEFFERNAN joins in this opinion.

The following memorandum was filed June 29, 1995.

PER CURIAM *(on motion for reconsideration).* On motion for reconsideration our attention has been called to an erroneous statement of law in the decision and for that reason the references to the State's burden of proof on the issue of waiver of *Miranda* rights as "beyond a reasonable doubt" is stricken. In lieu thereof the burden of proof approved by the United States Supreme Court in *Colorado v. Connelly,* 479 U.S. 157, 168 (1986), "by a preponderance of the evidence" is substituted. *See also State v. Beaver,* 181 Wis. 2d 959, 966–67, 512 N.W.2d 254 (Ct. App. 1994); *State v. Lee,* 175 Wis. 2d 348, 362–64, 499 N.W.2d 250 (Ct. App. 1993); *State v. Esser,* 166 Wis. 2d 897, 904–06, 480 N.W.2d 541 (Ct. App. 1992).

In addition, the following is stricken from page 21 of the slip opinion:

> While a juvenile's sixth and fourteenth amendment rights to counsel would be violated if he were forced to proceed with a sec. 48.21 hearing without having adequate time to consult with his attorney, this does not mean that police must cease their investigation immediately when the attorney arrives.

In lieu thereof the following is inserted:

> While a juvenile's sixth and fourteenth amendment rights to counsel would be violated if a juvenile petition had been filed prior to the sec. 48.21 hearing and he were forced to proceed with the hearing without having adequate time to consult with his attorney, this does not mean that police must cease their investigation immediately when the attorney arrives.

Finally a factual error appears at page 12 of the slip opinion. Jones and the juvenile intake worker were discussing Jones' statutory right pursuant to sec. 48.23(1), Stats., to have an attorney at his detention hearing, not his Sixth Amendment rights.

The motion for reconsideration is denied without costs.

In addition, the following is stricken from page 21 of the slip opinion:

> While a juvenile's sixth and fourteenth amendment rights to counsel would be violated if he were forced to proceed with a sec. 48.21 hearing without having adequate time to consult with his attorney, this does not mean that police must cease their investigation immediately when the attorney arrives.

In lieu thereof the following is inserted:

> While a juvenile's sixth and fourteenth amendment rights to counsel would be violated if a juvenile petition had been filed prior to the sec. 48.21 hearing and he were forced to proceed with the hearing without having adequate time to consult with his attorney, this does not mean that police must cease their interrogation immediately when the attorney arrives.

Finally a factual error appears at page 12 of the slip opinion. Jones and the juvenile intake worker were discussing Jones' statutory right pursuant to sec. 48.23(1), Stats., to have an attorney at his detention hearing, not his Sixth Amendment rights.

The motion for reconsideration is denied without costs.