STATE of Wisconsin, Plaintiff-Respondent,

v.

Dirk E. HARRIS, Defendant-Appellant-Petitioner.

Supreme Court

*No. 93–0730–CR. Oral argument October 31, 1995.—Decided February 29, 1996.*

(Also reported in 544 N.W.2d 545.)

For the defendant-appellant-petitioner there were briefs and oral argument by *William O. Marquis*, Milwaukee.

For the plaintiff-respondent the cause was argued by *Gregory Posner-Weber*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

JANINE P. GESKE, J.   This is a review of a published decision of the court of appeals, affirming the conviction of Dirk Harris for first-degree murder and armed robbery.[1] The court of appeals held that physical evidence recovered as a result of a statement taken after Harris had invoked his right to have counsel present during interrogation could be used in the prosecution's case-in-chief. We conclude that the circuit court committed error by not excluding physical evidence proximately derived from a violation of the bright-line rule articulated by the United States Supreme Court in *Edwards v. Arizona*, 451 U.S. 477 (1981), which bars all uncounseled police-initiated interrogation after invocation of the right to counsel. However, we hold that the error in this case was harmless, and we therefore affirm the judgment of conviction.

## FACTS

The body of Dennis Owens was discovered at approximately 4:15 a.m. on December 4, 1988. He died from multiple gunshot wounds to the head and chest, fired at close-range from a .22 caliber gun. A witness saw a gray Pontiac identified as belonging to the victim

[1] *State v. Harris*, 189 Wis. 2d 162, 525 N.W.2d 334 (Ct. App. 1994).

leaving the area. The next day, Harris was seen driving Owens' car. He also used Owens' credit card to purchase a bracelet. Harris's mother, Barbara Harris, told a co-worker that she was afraid that her son was involved in the murder because he had showed her identification belonging to the dead man. The police interviewed Barbara Harris and recovered the victim's identification and license plates from her trash. She told police that after her son called her at work and told her he needed money to leave town, she took him $180. The police arrested James Malone, who told them that Harris committed the murder. Harris was arrested in Amarillo, Texas, on December 6, 1988.

Public Defender Kathy Stilling, who had represented Harris on a previous matter, recognized his description in news reports of the incident and called the police station in Amarillo where Harris was being held. Harris returned her call and, after he indicated that he wanted her to represent him, attorney Stilling advised him that it would not be in his best interests to initiate conversation with law enforcement personnel or anyone else except his lawyer. Harris indicated that he understood and would not talk to anyone. Attorney Stilling then asked Harris to put the accompanying officer on the phone and told the officer that she represented Harris and that he had indicated his desire not to make any statements to Amarillo or Milwaukee authorities outside the presence of counsel. Harris then got back on the phone and Stilling heard him repeat that instruction to the officer. Stilling then called Assistant District Attorney Jackson in Milwaukee and informed him that she represented Harris and that he didn't wish to make any statements in the absence of counsel. She also called Milwaukee police

detective Sucik who was working on the case and told him the same thing.

A criminal complaint and felony warrant were issued in Wisconsin on December 7, 1988, charging Harris with first-degree murder and armed robbery. Following his arraignment that same day in Amarillo, Harris again informed the Amarillo police that he had made contact with his lawyer in Milwaukee and that he would make no statements to anyone without his lawyer being present. This information was recorded in the police incident report.

Milwaukee police detectives Sucik and Blazer were assigned to fly to Amarillo to accompany Harris back to Milwaukee. Before leaving Wisconsin, Sucik informed Blazer of the content of his conversation with attorney Stilling. On the morning of December 8, 1988, the two detectives arrived at the Amarillo police station where they reviewed police reports including the one containing the information that Harris had stated that "he would make no statements to anyone without his lawyer being present." After reviewing these reports, the detectives asked that Harris be brought to them.

At the suppression hearing, the detectives testified that they merely wanted to see Harris to advise him of the charges and to assess his demeanor for security reasons because they were responsible for escorting him back to Milwaukee on public carriers. Blazer testified that "armed with the knowledge that an attorney was representing him . . . I did not think that we would be able to talk to [Harris]." Despite that belief, Blazer admitted that he initiated the ensuing "conversation" that lasted somewhere between 45 minutes and an

hour. No *Miranda* warnings were given.[2] During the conversation, Blazer mentioned that he had spoken with Harris's mother. When Harris responded by asking what his mother had said, Sucik cautioned him about "getting into the offense itself," because of his request for an attorney. However, Sucik later left the room and Blazer testified that he continued the conversation by informing Harris that certain property of the deceased had been obtained from his mother's home and that people were in custody in Milwaukee in relation to the crime. Blazer stated that he had possibly even told Harris that his fingerprints had been found on the victim's license plates. When he was told that Malone had been arrested and charged with the murder, Harris responded that Malone "had nothing to do with it" and, at that point, indicated that he wanted to tell the detectives about the offense. Then Blazer recited the *Miranda* warnings and Harris said he was willing to waive his right to an attorney. Harris made a confession in which he admitted killing Owens and told the detectives how and where he had disposed of the gun he used.

After hearing Harris's motion to suppress, the circuit court ruled that the "conversation" amounted to interrogation which had been initiated by the police. Further, it found that the "detectives clearly overreached in their zeal." The court acknowledged that state-initiated communication after Harris had asserted his right to counsel triggered the per se exclusion of his subsequent statement according to *Edwards* and *Michigan v. Jackson*, 475 U.S. 625 (1986) (extending the Fifth Amendment-based *Edwards* proscription of further interrogation to the right to counsel

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

under the Sixth Amendment).[3] However, the circuit court went on to find that the statement Harris made after he was read his *Miranda* rights was based on a voluntary and knowing waiver which had not been coerced. It therefore concluded that although the statement must be suppressed in the State's case-in-chief, it could be used for impeachment purposes if Harris chose to testify.

The circuit court denied Harris's later motion to suppress the gun and other physical evidence recov-

---

[3] Although the circuit court found there had been a violation of the right to counsel under both the Sixth and Fifth Amendments, the parties' appellate briefs and the court of appeals' decision are limited to analysis under the Fifth Amendment. The Sixth Amendment right to counsel attaches upon formal commencement of prosecution, here in Wisconsin, upon filing of the criminal complaint or issuance of a warrant. *Jones v. State*, 63 Wis. 2d 97, 105, 216 N.W.2d 224 (1974). Both the criminal complaint and arrest warrant were issued for Harris on December 7, 1988, before Sucik and Blazer left for Texas. Once asserted, the Sixth Amendment right to counsel bars further uncounseled interrogation by police concerning the charged crime, and any subsequent waivers are presumed ineffective. *See Michigan v. Jackson*, 475 U.S. 625 (1986).

The Supreme Court, in *Nix v. Williams*, 467 U.S. 431 (1984), held that evidence concerning the discovery of the victim's body, whose location had been revealed during questioning violative of the Sixth Amendment right to counsel, was admissible through the inevitable discovery exception to the exclusionary rule. This holding clearly indicates that the Court's analysis began with the assumption that the exclusionary rule is applicable to physical evidence discovered through exploitation of a violation of the right to counsel under the Sixth Amendment. Although we find *Nix* informative, we do not rely on it because the parties neither briefed the Sixth Amendment issue, nor argued inevitable discovery and we conclude that this case can be fully resolved under the Fifth Amendment.

ered as a result of his statement. Relying primarily on a federal case from the Sixth Circuit,[4] the court concluded that nontestimonial physical evidence is admissible in the State's case-in-chief if the statement from which it was derived was voluntary.

Harris did not testify at his trial and his statement was not introduced. The prosecution did present evidence that the murder weapon, .22 caliber ammunition and the victim's keys had been recovered from a sewer located approximately two blocks from Harris's home. They also presented ballistic evidence that matched the gun to spent cartridges found at the crime scene. No identifiable prints were found on the gun, box of cartridges or keys. The jury returned a verdict of guilty on both counts. Harris appealed.

The court of appeals concluded that the circuit court had not erred in admitting the challenged evidence and affirmed Harris's conviction. *Harris*, 189 Wis. 2d at 165. It found that the circuit court had correctly concluded that Harris's confession was voluntary and held that "derivative, *non-testimonial* evidence is admissible when its discovery results from a suppressed, voluntary confession." *Harris*, 189 Wis. 2d at 177. This court subsequently granted Harris's petition for review.

## ISSUES

The issues presented by this case are of first impression in Wisconsin.[5] (1) Is it constitutional error

---

[4] *United States v. Sangineto-Miranda*, 859 F.2d 1501 (6th Cir. 1988).

[5] Not only is this a case of first impression in Wisconsin, but the United States Supreme Court has yet to rule directly on point. The Court has not addressed the question of admissibility of physical evidence derived from an *Edwards* violation. The

to admit, in the State's case-in-chief, physical evidence discovered solely through a statement taken in violation of the *Edwards* proscription against police-initiated interrogation following a suspect's invocation of the right to counsel under the Fifth Amendment? (2) If so, is such error subject to harmless error analysis? Resolution of these questions requires constitutional interpretation and application of constitutional principles to facts as established by the circuit court. Both are tasks which this court undertakes without deference to the courts below. *State v. Jones*, 192 Wis. 2d 78, 92-3, 532 N.W.2d 79 (1995).

## APPLICABILITY OF THE EXCLUSIONARY RULE

In *Miranda v. Arizona*, 384 U.S. 436, 467 (1966), the Supreme Court fashioned a set of procedural guide-

---

admissibility of such evidence derived from a *Miranda* violation has been broached but not reached.

In *New York v. Quarles*, 467 U.S. 649 (1984), the Court delineated a "public safety" exception to the requirement of pre-interrogation administration of *Miranda* warnings. Because it ruled there had been no *Miranda* violation in the instant case, the Court found no occasion to reach the question whether the gun discovered via the unwarned statement should be admitted either as nontestimonial evidence or through the inevitable discovery exception to the exclusionary rule. *Quarles*, 467 U.S. at 660 n.9.

Justices White and Brennan dissented to a denial of certiorari in a case involving the admissibility of physical evidence obtained through an unwarned statement on the basis that the Court should answer the question presented which had been expressly left open in *Michigan v. Tucker*, 417 U.S. 433, 447 (1974) and was not squarely addressed in *Oregon v. Elstad*, 470 U.S. 298 (1985). *Patterson v. United States*, 485 U.S. 922 (1988) (White, J., with whom Brennan, J., joins, dissenting from the denial of certiorari).

237

lines designed to protect a suspect's rights under the Fifth Amendment from the "inherently compelling pressures" of custodial interrogation. The Court held that the prosecution was barred from using any statements obtained through custodial interrogation unless it could "demonstrate[ ] the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. The Court recommended that the following, now familiar, procedure be employed:

> [A suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that **he has the right to the presence of an attorney**, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479 (emphasis added). The Court went on to stress that the "[o]pportunity to exercise these rights must be afforded to [a suspect] throughout the interrogation." And, although a suspect may waive these rights after being given warnings, "unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Id.*

This per se exclusionary rule was extended in *Edwards v. Arizona*, 451 U.S. 477 (1981). The suspect in *Edwards* was informed of his rights under *Miranda* and initially stated he was willing to submit to questioning. When Edwards later stated that he wanted an attorney, the questioning ceased. However, the next morning, before he had been allowed contact with an attorney, two detectives came to see him in the jail. Although Edwards told the guard he did not want to

talk to anyone, he was told that he "had to." He was taken to the officers who read him his *Miranda* rights again and Edwards then gave an inculpatory statement. *Edwards*, 451 U.S. at 478-79.

The Court reversed Edwards' conviction on the basis that use of his statement violated his rights under the Fifth and Fourteenth Amendments. The Court held that, an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication." *Id.* at 484-85. According to the Court, the *Edwards* bright-line proscription "serves the purpose of providing 'clear and unequivocal' guidelines to the law enforcement profession. Surely there is nothing ambiguous about the requirement that after a person in custody has expressed his desire to deal with the police only through counsel, he 'is not subject to further interrogation by authorities until counsel has been made available to him, . . .' " *Arizona v. Roberson*, 486 U.S. 675, 682 (1988) (quoting *Edwards*, 451 U.S. at 484-85). The *Edwards* rule is "designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983).

In reaching our decision today, we find it significant that the Court has commented that the per se aspects of both the *Miranda* and *Edwards* rules are,

> based on this Court's perception that the lawyer occupies a critical position in our legal system because of his [or her] unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation. . . . "The right to have counsel present at the interrogation is indispensable to the

239

protection of the Fifth Amendment privilege under the system" established by the Court.

*Roberson*, 486 U.S. at 682 n.4 (quoting *Fare v. Michael C.*, 442 U.S. 707, 719 (1979)).

The State concedes that the police conduct here violated the proscription against initiating questioning of a suspect who has asserted his right to counsel and that any statements thus obtained must be excluded. [6] However, the State argues that physical evidence derived from a statement taken in violation of *Edwards* is admissible so long as the statement itself was constitutionally voluntary, i.e. non-coerced. The State bases its argument on the same cases relied upon by the court of appeals—*Michigan v. Tucker*, 417 U.S. 433, 435 (1974); *Oregon v. Elstad*, 470 U.S. 298 (1985); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1516 (6th Cir. 1988); and *United States v. Cherry*, 794 F.2d 201 (5th Cir. 1986), *cert. denied*, 479 U.S. 1056 (1987). To assess the State's argument, it is necessary to analyze the applicability of each of the cases cited.

In *Michigan v. Tucker*, 417 U.S. 433, 435 (1974), the Supreme Court addressed the issue of whether the testimony of a witness "must be excluded simply because police had learned the identity of the witness by questioning [Tucker] at a time when he was in custody as a suspect, but had not been advised that counsel would be appointed for him if he was indigent." Prior to questioning, the police warned Tucker that he had the right to remain silent and that anything he

---

[6] We note that the critical facts in this case are readily distinguishable from those we encountered in our recent decision, *State v. Coerper*, 199 Wis. 2d 216, 544 N.W.2d 423 (1996), in which the right to counsel under the Fifth Amendment was not implicated because the defendant never personally asserted this right.

said could be used against him. When asked if he wanted an attorney, he responded in the negative. *Id.* at 444-45. The police failed to inform Tucker that if he was indigent, counsel would be provided for him.

The *Tucker* Court characterized the problem it faced as one of defining the proper scope of consequences to be judicially imposed as a result of an inadvertent disregard of *Miranda's* procedural rules. *Tucker*, 417 U.S. at 445. The Court held that Tucker's statement must be suppressed pursuant to *Miranda*. However, it concluded that *Wong Sun v. United States*, 371 U.S. 471 (1963), which requires suppression of the "fruits" of police conduct that actually infringes on a suspect's Fourth Amendment rights, was not controlling as to the testimony of the witness. The Court found that the police conduct at issue "did not abridge [Tucker's] constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down by the Court in *Miranda* to safeguard that privilege." *Tucker*, 417 U.S. at 446.

Tucker's interrogation took place before the release of the *Miranda* decision, but the trial occurred afterwards. The Court found it significant that Tucker was adequately informed of his rights under the principles of the controlling law at the time, *Escobedo v. Illinois*, 378 U.S. 478 (1964). *Tucker*, 417 U.S. at 447. The deterrent purpose underlying the exclusionary rule, which "necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right," lost much of its force when, as in the case at bar, the police had acted in good faith. *Id.* The *Tucker* Court distinguished *Escobedo*, in which the suspect's express and repeated requests to see his lawyer were denied, as

241

being "in direct contrast to the situation here."[7] *Tucker*, 417 U.S. at 447 n.22.

In *Oregon v. Elstad*, 470 U.S. 298 (1985), the Supreme Court framed the issue before it as:

> whether an initial failure of law enforcement officers to administer the warnings required by *Miranda v. Arizona*, **without more**, "taints" subsequent admissions made after a suspect has been fully advised of **and has waived** his *Miranda* rights.

*Elstad*, 470 U.S. at 300 (citation omitted, emphasis added). While police were serving a warrant for his arrest on suspicion of burglary, Elstad made an incriminating statement before he had been given *Miranda* warnings. Elstad was subsequently taken to police headquarters where, after he was fully advised of his *Miranda* rights, he indicated he understood his rights but wished to speak with the police. He then gave a written statement describing his involvement in the burglary. The Court found that the initial statement must be suppressed as violative of *Miranda* but concluded that, in the absence of coercion or improper police tactics, subsequent voluntary statements taken after proper administration of warnings and valid waiver of rights need not be suppressed. *See Elstad*, 470 U.S. at 308-09.

In *Sangineto-Miranda*, the Sixth Circuit addressed the issue of "whether nontestimonial physical evidence proximately derived from a *Miranda*

---

[7] The Court's language implies that the outcome might have been different if Tucker had asserted his right to have counsel present. The broader implication is that a violation of an asserted right is substantively different than a simple defect in warning a suspect of the existence of that right.

violation is inadmissible as 'fruit of the poisonous tree.'" *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1516 (6th Cir. 1988). In response to a question posed prior to administration of *Miranda* warnings, the suspect told police where his truck was located. Drugs were found in the truck. Relying heavily on *Elstad*, the federal appellate court concluded that the evidence was admissible because the location of the truck had been revealed in a voluntary statement and there were no indications of coercion. *Id.* at 1518. Again, as in *Elstad* and *Tucker*, the violation was limited to a defect in the administration of required warnings. In *Sangineto-Miranda*, the drugs were discovered pursuant to a consensual search of the truck conducted after the suspect had been informed of, and voluntarily waived his *Miranda* rights. *Id.* at 1519.

Of the cases relied upon by the court of appeals, only *United States v. Cherry*, 794 F.2d 201 (5th Cir. 1986), involves the admissibility of physical evidence discovered as a result of a statement taken in violation of *Edwards*. Unlike the court of appeals, however, we do not find the facts in *Cherry* "virtually identical"[8] to those we face. After his identification was found in the backseat of a murdered cab driver's taxi, Cherry was taken into custody by FBI and CID agents at Fort Bliss, Texas, on suspicion of murder.[9] During questioning,

[8] In its opinion, the court of appeals drew heavily upon *Cherry*, which it characterized as involving "virtually identical circumstances." *Harris*, 189 Wis. 2d at 177.

[9] The arrest was later held to be illegal. *United States v. Cherry*, 794 F.2d 201, 203 (5th Cir. 1986). Cherry's cause was twice remanded to the district court on various claims. *See Cherry*, 794 F.2d at 204. We are concerned in the present analysis only with the opinions rendered by the Fifth Circuit in its third review of the matter.

243

Cherry was twice informed of his *Miranda* rights and signed waivers thereof. He also consented to a search of his cubicle area in the barracks. Agents found the victim's billfold and had begun to search space in the ceiling panels above Cherry's cubicle but suspended their efforts when it grew dark. *Cherry*, 794 F.2d at 203.

At some point during interrogation the next day, Cherry said, "maybe I should talk to an attorney before I make a further statement." *Cherry*, 794 F.2d at 203. The FBI agents told Cherry that an attorney would probably advise him to remain silent but they did not try to secure counsel for him. They did, however, ask if he wanted to be alone to consider whether to make further statements. At this point, Cherry asked to see one of his sergeants. While waiting for the sergeant to arrive, the FBI agents mentioned that fellow soldiers had seen him with a .32 caliber pistol and yet Cherry had told them he did not own one. Cherry responded, "haven't you found the gun yet?" *Id.* He then told agents the murder weapon was hidden in the ceiling compartment above his cubicle, confessed to the murder and signed written consent for a second search. *Id.* at 203-04.

The court found that although Cherry's request for counsel had been equivocal, it constituted assertion of his right to counsel and his confession must be suppressed as violative of *Miranda* and *Edwards*. *Cherry*, 794 F.2d at 204. On review of the propriety of suppression of the gun, the court concluded that there had been no violation of Cherry's Fifth Amendment rights because his statements and consent to search had been voluntarily given. The court relied on *Elstad* and *Tucker* in holding that the murder weapon was, therefore, properly admitted. *Id.* at 208.

We find that there are critical distinctions, both factual and legal, between *Cherry* and the case at hand.[10] It is notable that *Cherry* was decided in 1986, before the Supreme Court's ruling that a request for counsel must be unambiguous in order to preclude further questioning. *Davis v. United States*, 114 S.Ct. 2350, 2355 (1994).[11] Prior to his equivocal comment about counsel, Cherry had twice waived his *Miranda* rights and had consented to search of the area where the weapon was eventually found.[12] In contrast, Harris unequivocally and unambiguously expressed his desire to face custodial questioning only in the presence of his attorney. Further, although Sucik cautioned Harris to stay away from the topic of the murder because he had requested counsel, the detectives did not read Harris his *Miranda* rights and Harris did not purport to waive any rights until after more than 45 minutes of "conversation" about the crime.

Of greater importance to our analysis, the cases on which the *Cherry* decision rests (*Tucker* and *Elstad*) involved only defects in the administration of *Miranda* warnings. As does the court of appeals, *Cherry* blurs any distinction between mere failure to administer *Miranda* warnings "**without more**" (*Elstad*, 470 U.S. at 300) and violations of the bright-line rule of

[10] Further, we point out that, although they may at times be informative, we are in no way bound by decisions of the federal circuit courts even if they are on all fours with the case before us. *See Thompson v. Village of Hales Corners*, 115 Wis. 2d 289, 307, 340 N.W.2d 704 (1983).

[11] *See also State v. Jones*, 192 Wis. 2d 78, 95 n.4, 532 N.W.2d 79 (1995).

[12] In fact, on the second remand, the court determined that the gun was admissible under the inevitable discovery rule. *Cherry*, 794 F.2d at 204.

*Edwards* which is triggered upon assertion of the right to have counsel present during interrogation. *Cherry* states that, "*Elstad* makes clear that failure to give **or carry out the obligation of *Miranda* warnings** in and of itself is not a constitutional infringement." *Cherry*, 794 F.2d at 207 (emphasis added).

On the contrary, nowhere in *Elstad* does the Court equate failure to administer warnings with failure to "carry out the obligations" of *Miranda*. *Elstad* limits its discussion of the inapplicability of the *Wong Sun* doctrine to instances of error in administering *Miranda*'s prophylactic warnings. *Elstad*, 470 U.S. at 309. The *Elstad* Court expressly distinguished the case at bar from those involving statements elicited after invocation of the rights enumerated in *Miranda*:

> Most of the 50 cases cited by JUSTICE BRENNAN [dissent] in his discussion of consecutive confessions concern an initial unwarned statement obtained through overtly or inherently coercive methods which raise serious Fifth Amendment and due process concerns. . . . JUSTICE BRENNAN cannot seriously mean to equate such situations with the case at bar. **Likewise inapposite are the cases the dissent cites concerning suspects whose invocation of their rights to remain silent and to have counsel present were flatly ignored while police subjected them to continued interrogation.**

*Elstad*, 470 U.S. at 312-13, n.3 (emphasis added).

In line with the reasoning employed in *Cherry*, the State contends that a violation of *Edwards* does not constitute violation of a substantive constitutional right, but merely of the prophylactic rules designed to

246

protect that right.[13] The State argues that a violation of *Edwards* is no more egregious and, if anything, is less serious than a defect in the "core requirement" of administering the *Miranda* warnings. The State asserts that, like *Miranda*, an *Edwards* violation does not automatically constitute a violation of the Fifth Amendment and therefore should not trigger the fruit of the poisonous tree doctrine in the absence of actual coercion by the police.

The primary flaw in the State's argument is the failure to distinguish between violation of a procedure (informing an accused of his rights) and violation of a right (the right to have counsel present during interrogation). The procedure required under *Miranda* is that warnings must be given prior to custodial interrogation, while the procedure required by *Edwards* is that once a suspect invokes the right to counsel, all police-initiated questioning must cease until counsel is present. With the former, it is possible to act in a manner that is violative of the safeguard but not of the rights it seeks to protect; this is not possible with conduct that violates *Edwards*. A violation of *Edwards* is a violation of the right to counsel under the Fifth Amendment.

---

[13] The State correctly points out that the bright-line rule established in *Edwards* has alternatively been referred to as a "prophylactic rule" (*Michigan v. Harvey*, 494 U.S. 344, 349 (1990)) and a "second layer of prophylaxis" (*McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991)). It has also been referred to as a "corollary to *Miranda*" (*Arizona v. Roberson*, 486 U.S. 675, 680 (1988)), and "reinforce[ment of] the [*Miranda*] protections" (*Minnick v. Mississippi*,498 U.S. 146, 147 (1990)). It is not the nomenclature that concerns us so much as the substance of the protections crafted by the Court in *Miranda, Edwards* and their progeny and the impact of violations thereof on constitutionally-protected rights.

We find that there is a critical difference between a mere defect in the administration of *Miranda* warnings "without more" and police-initiated interrogation conducted after a suspect unambiguously invokes the right to have counsel present during questioning. The latter is a violation of a constitutional right.[14] As such, an *Edwards* violation triggers the fruit of the poisonous tree doctrine requiring the suppression of the fruits of that constitutional violation. In arriving at this conclusion, we have not sailed alone into uncharted waters. Several courts have followed similar reasoning and reached the same result—that physical evidence derived from statements taken in violation of a suspect's asserted right to counsel must be suppressed.[15]

[14] " '[T]he right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege,' " *Fare v. Michael C.*, 442 U.S. 707, 719 (1979), (quoting *Miranda*, 384 U.S. 436, 469 (1966)); "an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation," *Edwards v. Arizona*, 451 U.S. 477, 482 (1981); after invocation, "subsequent incriminating statements made without his attorney present violated the rights secured to the defendant by the Fifth and Fourteenth Amendments," *Oregon v. Bradshaw*, 462 U.S. 1039, 1043 (1983) (describing the *Edwards* holding).

[15] *See, e.g., Boles v. Foltz*, 816 F.2d 1132 (6th Cir. 1987), *cert. denied*, 484 U.S. 857 (1987) (finding as harmless error improper admission of confession and its derivative evidence obtained through interrogation following invocation of rights under *Edwards*); *United States v. Downing*, 665 F.2d 404 (1st Cir. 1981) (holding any evidence obtained as a result of violation of suspect's Fifth Amendment right to have counsel present during interrogation is inadmissible); *United States ex rel. Hudson v. Cannon*, 529 F.2d 890 (7th Cir. 1976) (holding denial of suspect's requests to call attorney entitled him to establish that his

We agree with the Court in *Elstad* that the analysis employed therein is "inapposite" once the right to silence or counsel has been asserted, and we decline to extend *Elstad* to cover evidence obtained in violation of *Edwards*. Therefore, we conclude that the circuit court erred by allowing the prosecution to use the items retrieved from the sewer (the gun, bullets, and keys) in its case-in-chief.

Further, once a criminal suspect invokes his or her right to counsel, judicial inquiry into voluntariness, i.e. whether subsequent statements were actually coerced,

right to counsel had been violated and that testimony of accomplices was "tainted fruit" of these violations); *United States v. Massey*, 437 F. Supp. 843 (M.D. Fla. 1977) (concluding fruit of poisonous tree doctrine applicable to all indirect evidence, testimonial and tangible, acquired through suspect's admissions made in violation of asserted right to counsel under the Fifth Amendment); *Commonwealth v. White*, 371 N.E.2d 777, 780-81 (Mass. 1977), *aff'd by an equally divided court*, 439 U.S. 280 (1978) (finding that evidence obtained after suspect had "affirmatively demonstrated a desire for the assistance of counsel" could not be used).

    *See also* Mark S. Bransdorfer, *Miranda Right-to-Counsel Violations and the Fruit of the Poisonous Tree Doctrine*, 62 Indiana L.J. 1061, 1099-1100 (1987).

> The bright-line rules *Miranda v. Arizona* announced, the so-called prophylactic safeguards, should not be allowed to block the effective assertion of other rights, constitutional in nature, which *Miranda* reaffirmed. . . . The right to counsel, once invoked by a suspect in a custodial interrogation setting whatever its source, is more than a mere procedural device. . . . *Wong Sun*'s fruit of the poisonous tree doctrine should apply with its full and reasonable vigor to second generation derivative evidence after an *Edwards* violation.

249

is "beside the point."[16] *Smith v. Illinois*, 469 U.S. 91, 99 n.8 (1984). "[T]he voluntariness of a consent or an admission on the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries." *Edwards*, 451 U.S. at 484.

Following invocation, the key issue becomes whether the right to counsel was effectively waived. A suspect may, of course, choose to waive his right to counsel, but even suspect-initiated conversation does

[16] Throughout the course of this case Harris has argued that the gun and other physical evidence should be excluded because his statements to Sucik and Blazer were coerced under the traditional due process voluntariness standard. We will not address these arguments further as voluntariness is not the critical factor in determining whether evidence gathered in violation of *Edwards* is admissible in the State's case-in-chief.

Alternatively, Harris asks this court to base its decision on an affirmation of what he characterizes as the primary principle of *Wentela v. State*, 95 Wis. 2d 283, 299-300, 290 N.W.2d 312 (1980),— that the tainted fruit of illegal confessions must be suppressed. In 1980, this court found Wentela's statement, "I think I need an attorney," sufficient as an assertion of the right to counsel and yet we declined to apply a blanket bar on further questioning or a per se exclusionary rule to evidence obtained after assertion of the right to counsel. *Id.* at 292. Instead, we applied the "scrupulously honored" standard from *Michigan v. Mosley*, 423 U.S. 96 (1975), (which involved violation of the asserted right to silence) in finding that because the defendant's rights had not been respected his subsequent statements must be suppressed. *Id.* at 299. While we do not overrule *Wentela*, neither do we rely on it as controlling. Too much critical law has since been made (*Wentela* was decided before *Edwards, Elstad* and *Davis*). We find that *Wentela* gives us very little guidance today.

not constitute *a priori* proof of waiver.[17] A valid waiver of an asserted right "cannot be established by showing only that [the suspect] responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* Further, if the authorities reinitiate contact, "it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Roberson*, 486 U.S. at 681. The Court has consistently held that, following assertion of the right to counsel, police-initiated interrogation renders purported waivers ineffective and thus statements so obtained are inadmissible as substantial evidence in the prosecution's case-in-chief even if preceded by a purported waiver.[18] *See McNeil*, 501 U.S. at 177.

The circuit court found that detectives Sucik and Blazer initiated interrogation after Harris had unequivocally invoked his right to have counsel present during questioning. We conclude that this

---

[17] *See Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983) (even if the suspect initiates contact after invocation, "the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation").

[18] Although the circuit court used the word "waiver" in ruling that Harris' statement was available for impeachment purposes, there was no mention of the presumption against the validity of that waiver nor does the record reflect the inquiry required to determine that a suspect has knowingly and intelligently waived a known right. The court's analysis appears to have been limited to the question of voluntariness under due process standards.

251

questioning constituted a substantive violation of Harris's rights under the Fifth and Fourteenth Amendments. The fact that 45 minutes to one hour after initiating the "conversation" Blazer recited the rights that *Miranda* was crafted to protect and that Harris then "waived" those rights, does not alter our conclusion. That waiver is presumed to be the product of the inherently compelling atmosphere of custodial interrogation and is, therefore, invalid. Today we follow the teaching of the Court in *Edwards* when it concluded that "the fruits of the interrogation initiated by the police . . . could not be used against Edwards."[19] *Edwards*, 451 U.S. at 485. Both the statement and its fruits were inadmissible in the State's prosecution of Harris.

## HARMLESS ERROR

We conclude that although the circuit court erroneously admitted the physical evidence derived from the *Edwards* violation, such error was harmless and, therefore, Harris's conviction should stand.

The Supreme Court fashioned a "harmless-constitutional-error rule" in *Chapman v. California*, 386 U.S. 18, 22 (1967), a case that involved denial of the defendants' rights under the Fifth and Fourteenth Amendments.[20] The Court held that for a federal con-

---

[19] The "fruits of interrogation" at issue in *Edwards* are discussed only in terms of the defendant's confession and involuntary statements, not physical evidence.

[20] The defendants had been tried under a California constitutional provision that allowed the prosecution to comment on a defendant's failure to testify in his defense and to urge the jury to draw inferences of guilt therefrom. While Chapman and co-defendant Teals' appeal was pending, this provision was struck down in *Griffin v. California*, 380 U.S. 609 (1965), on the

stitutional error to be held harmless, "the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. In *Chapman*, the Court indicated that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error," and cited as examples the use of a coerced confession, right to an impartial judge and right to counsel.[21] *Id.* at 23 and n.8.

And yet, in *Arizona v. Fulminante*, 499 U.S. 279, 285 (1991), a plurality of the Court determined that it was appropriate to apply harmless error analysis to the admission of a coerced confession. The Court also utilized the harmless error test in review of a violation of the Sixth Amendment right to counsel. *See Satterwhite v. Texas*, 486 U.S. 249, 256-57 (1988) (involving the erroneous admission of a doctor's testimony which was based on a psychiatric examination conducted outside the presence of and without the advice of counsel). The *Satterwhite* Court distinguished the case at hand from those involving Sixth Amendment violations that pervade the entire proceeding and thereby cast so much doubt on the trial's fairness that they should never be deemed harmless, pointing out that:

> [w]e have permitted harmless error analysis in both capital and noncapital cases where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial.

grounds that it punished a defendant for exercising the right against compelled self-incrimination. *Chapman v. California*, 386 U.S. 18, 19 (1967).

[21] The case *Chapman* cites regarding the right to counsel is *Gideon v. Wainwright*, 372 U.S. 335 (1963), which involved a total deprivation of counsel throughout proceedings.

*Satterwhite*, 486 U.S. at 257.

The *Fulminante* Court pointed to numerous other instances, since *Chapman*, in which constitutional error has been treated as harmless. Those particularly relevant to our decision today include: *Crane v. Kentucky*, 476 U.S. 683 (1986) (exclusion of defendant's testimony concerning circumstances surrounding his confession); *United States v. Hasting*, 461 U.S. 499 (1983) (improper comment on defendant's silence at trial in violation of the Fifth Amendment privilege against self-incrimination); *Moore v. Illinois*, 434 U.S. 220 (1977) (introduction of testimony identifying the accused from uncounseled line-up conducted in violation of the Sixth Amendment).[22]

The Court found that the critical "common thread" in these cases was that they all involved " 'trial error'—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 307-08.

---

[22] As is logically implied by the dearth of Supreme Court cases that directly address the issue at hand, the Court has yet to apply harmless error to a fully analogous case. *Milton v. Wainwright*, 407 U.S. 371 (1972), a habeas corpus review, provides the closest authority. There, the Court did not find a need to reach the merits of the petitioner's "arguable" claims of *Miranda* and Sixth Amendment right to counsel violations because it found that admission of the challenged evidence was harmless beyond a reasonable doubt. The Seventh Circuit has applied harmless error to evidence admitted in violation of *Miranda* (*See United States v. Jackson*, 429 F.2d 1368, 1372-73 (7th Cir. 1970)), and to "arguable" violations of *Edwards* (*United States v. D'Antoni*, 856 F.2d 975, 982 (7th Cir. 1988)).

We agree with the principles expressed above, and like the Supreme Court, remain:

> faithful to the belief that the harmless-error doctrine is essential to preserve the "principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error."

*Fulminante*, 499 U.S. at 308 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)).

In *State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222 (1985), this court attempted to clarify the standard to be applied in Wisconsin to appellate review of harmless error; "whether of omission or commission, whether of constitutional proportions or not, the test should be whether there is a reasonable possibility that the error contributed to the conviction." Alternatively stated, we held that where there is error, "a court should be sure that the error did not affect the result or had only a slight effect." *Id.* at 540. We discussed the similarities between the *Dyess* test and that utilized in *Strickland v. Washington*, 466 U.S. 668 (1984), to assess prejudice in cases of ineffective assistance of counsel, and favorably noted the flexibility of such analyses that focus on whether or not the error undermines confidence in the outcome of the proceeding. *Dyess*, 124 Wis. 2d at 544-45.

In a case decided two years before the *Dyess* standard was adopted, this court was faced with the task of reviewing statements admitted into the State's case-in-

chief that were obtained after the defendant had invoked his right to counsel under the Fifth Amendment. *State v. Billings*, 110 Wis. 2d 661, 329 N.W.2d 192 (1983).[23] Because we found the error was not harmless beyond a reasonable doubt (applying the *Chapman* standard), we did not find it necessary to reach the larger question of whether such error could ever be deemed harmless.[24] *Billings*, 110 Wis. 2d at 666. Today we take the opportunity to clarify that the *Dyess* harmless error test is applicable to the erroneous admission of evidence obtained in violation of *Edwards*.

We must now apply the harmless error standard to the evidence before us. Our task is to examine the erroneously admitted evidence and the remainder of the untainted evidence in context to determine whether the error was harmless. *Billings*, 110 Wis. 2d at 673; *see also Fulminante*, 499 U.S. at 310. In the case before us, the following untainted evidence was presented to the jury.

The body of Dennis Owens was discovered by Mr. Hungelmann, a security guard who worked in a building in the 300 East block of Florida Street in the City of Milwaukee. At approximately 4:00 or 4:15 a.m. on the morning of December 4, 1988, Hungelmann saw a car

---

[23] The inquiry in *Billings* is framed in terms of the applicability of harmless error analysis to a violation of the right to counsel under *Miranda*. *State v. Billings*, 110 Wis. 2d 661, 329 N.W.2d 192, 665-66 (1983). No mention is made of *Edwards*.

[24] The court of appeals, in *State v. Goetsch*, 186 Wis. 2d 1, 11, 519 N.W.2d 634 (Ct. App. 1994), found that statements made after the defendant had invoked his right to silence were erroneously admitted. Applying the *Dyess* analysis, the court concluded that the error was harmless in that it "could not reasonably have contributed to [Goetsch's] conviction." *Id.*

heading slowly down the street which made two U-turns, then stopped in front of his building. The car was only about 15 feet away and Hungelmann saw only one person in the car, the driver. Although he could not make a positive identification, he testified that the man was white. The car was a bluish gray, 1984 or 1985 model. He wrote down the license plate number which was traced to the victim, Dennis Owens. Hungelmann testified that when he stepped outside the building he saw something in the street and, as he walked over to see what it was, the car took off. He found that the object in the street was an African-American man lying on his side who looked dead.

There was very little blood at the site where the body was found. However, there was a smear or skid mark leading away from the body which ran approximately 300 feet across a set of railroad tracks into a field. Just east of the railroad tracks, where the skid mark ended, the police found tire tracks, blood on the gravel, three live bullets and two spent casings. There, they also found a man's jacket with tire marks running across it.

Harris's co-defendant, James Malone, testified that he and Harris had been out drinking on the night of December 3, 1988.[25] At approximately 10 p.m. that night they left a bar in Harris's station wagon, which Malone noticed had a Diamond Jim "license applied for" placard in place of the rear license plate. Harris drove to his home at 29th and Scott, went in alone and came back out with a gun and a box of shells which he put under the seat when he got back in the car. After having a few more beers in another bar, the two got

---

[25] The court informed the jury that Malone, being tried separately, was charged with the same crimes as Harris—first degree homicide and armed robbery as a party to the crime.

into Harris's car again and Harris said, "let's go down to the fag bars and roll a queer."

Malone stated that he told Harris he'd been in jail briefly and didn't want to get into any more trouble, so at about 11 p.m. when Harris parked the car in an area near some gay bars, Malone stayed in the car and fell asleep. Malone testified that he was awakened about 2:30 a.m. when Harris knocked on the window saying he'd be back in about 10 minutes. Malone looked out the window and saw a car idling across the street with its lights on and someone sitting in the front seat. He fell asleep again until Harris woke him and said, "I just shot a nigger."

Malone testified that he was told to drive Harris's car and follow Harris, who was driving the car that Malone had previously seen idling across the street. After parking the victim's car near his house, Harris got back into the station wagon and told Malone he wanted to go back to where the body was. On the way, Harris said the gun had jammed earlier but then tested it and was able to successfully fire it from inside the car. Harris told Malone he would also have to shoot the man to "finish the job." Malone testified that Harris held a gun to his head and said, "if you don't, I'll kill you." Harris directed Malone to drive to a field and when they stopped, Malone saw the body of an African-American man and blood all over the ground. Malone refused to shoot the man, who looked like he was already dead. Harris went through the man's coat and pants pockets and, after searching the body, shot the man twice in the back of the head.

Harris then drove Malone home, dropping him off about 3 a.m. Harris woke Malone up later that day and said that the man he had killed was a TV-6 cameraman. He asked if Malone wanted to go shopping with

him using the man's credit cards. Malone declined and Harris left stating he'd be in touch.

The State presented the following testimony which corroborates Malone's version of the events. Although Harris's mother, Barbara, took the position on the stand that she didn't remember anything, detective Kraus, of the Milwaukee Police Department, testified as to his interview with Mrs. Harris at her home the day after the murder. At that time, she told the police that earlier that day Harris had called her at work and said he was leaving town and needed money. She left work, got $180 out of her credit union and took it to a tavern where she met her son and gave him the money. While being interviewed, Mrs. Harris indicated that items belonging to the victim were located in her garbage. The police retrieved the victim's driver's license, credit cards, work and other identification cards. They also recovered the license plates of the vehicle belonging to the victim.

A co-worker of Mrs. Harris testified that on the morning of December 5, 1988, Barbara Harris had asked her if she'd heard about the murder of a Channel 12 news reporter.[26] Mrs. Harris was upset and crying and told the witness that she'd seen the reporter's credit cards in her son's possession and that he had dumped them in the trash.

An employee of a jewelry store positively identified Harris as the man who came into her store on the afternoon of December 5, 1988, and purchased a 14-carat gold filigree bracelet. The total cost was $158.13, which Harris paid using a credit card in the name of Dennis Owens. Harris signed Owens' name to the

---

[26] The witness later acknowledged that she could be confused about what channel the man worked for. The victim, Dennis Owens, was a cameraman for Channel 6.

credit card slip. Later that afternoon, Harris drove to his girlfriend's house in the victim's 1985 Pontiac. The two drove to a movie together and afterwards Harris gave his girlfriend the bracelet he had purchased with Owens' credit card. He told her he was in trouble and was going to leave town. The next day, Harris was arrested in Amarillo, Texas.

The State also presented testimony of two inmate witnesses whom the jury was told had been given consideration for their testimony. In December of 1988, while Michael Peterson and Harris were cellmates in Milwaukee County Jail, Harris told Peterson that he and Malone had been together on the night of the murder but that Malone had gotten drunk and fallen asleep in the car. Harris said that he had gotten into the car of an African-American male who drove to a dead end street and shut off the car's ignition. Harris said that after the man grabbed him in the groin, he shot him and pushed him out of the car. Harris also told Peterson that he had driven back and forth over the body, and although the body had originally been on gravel, it got stuck under the car and he had to drive a distance until he got to a hard surface and could shake the body from the undercarriage. Harris said he'd later gone to the victim's apartment and ripped him off.

Harris and Ricky Loney met as inmates at the Dodge Correctional Institute. Loney testified that Harris approached him in June of 1989 and, over the next few days, told Loney a version of the events surrounding the murder that very closely matched Malone's testimony. Additionally, Harris said that he'd used the victim's keys to enter his apartment and steal a VCR and microwave and had left the door open. Loney testified that Harris also told him that he'd used the victim's credit card to buy jewelry for his girlfriend.

Harris said that he'd stolen the gun used in the murder in an earlier burglary in Cudahy and that, after the murder, he'd gotten rid of it in a sewer near his home. He also told Loney he had abandoned the car after getting rid of the license plates.

The defense countered the above evidence with its theory that Harris's involvement was limited to accepting and using stolen property. In closing arguments, defense counsel depicted Harris as a "dummy" who had "gotten in over his head." It was not contested that Harris had used the victim's credit cards to buy jewelry nor that he had driven Owens' car. But the defense asserted that it was not until Harris saw the news about the murder that he decided he'd better get out of town.

According to the defense, Malone was involved in the murder with a second man who was not Harris. The defense raised the possibility that the real killer was one of two other men, Glen Conroy or Arthur Fromke. A witness testified that at about 3:30 or 4:00 a.m. on December 4, 1988, he had seen an African-American man driving a dark blue or gray car stop, open the passenger door and begin talking to a young white man walking by. The witness identified the two men as the victim and Conroy. A second security guard at the building where Owens' body was found picked Arthur Fromke's photo out of a photo array as the driver of the car that left the murder scene at 4:08 a.m. However, the State presented witnesses who testified that Conroy and Fromke were at their homes on the night of the murder. The defense generally characterized the testimony of Malone and the two inmate witnesses as self-serving lies and urged the jury to discount their testimony.

The following additional evidence was presented by the State in support of Harris's culpability in the murder. Police discovered that the car Harris had been using prior to the murder was itself stolen. After police returned the vehicle to its owner, she found a spent casing on the floor under the front seat. The casing matched those found at the murder scene and corroborates Malone's testimony that Harris test-fired the gun while in that car.

At approximately 6 a.m. on December 4, 1988, the police went to the victim's apartment where they found the door open and lights on. There were no signs of forced entry. A neighbor testified that when he arrived home at 1 a.m., the lights were out and the door closed. The neighbor also told investigating officers that Owens' microwave and VCR were missing from the apartment.

The autopsy revealed that Owens had been shot five times—twice in the chest, once in the stomach, and twice in the back of his head. His body showed abrasions consistent with having been dragged for a distance across gravel and/or pavement. The victim's car was discovered parked on West Scott Street, approximately two blocks from Harris's residence. There were no metal license plates on the vehicle, only temporary "license applied for" placards from Diamond Jim's. Hair and blood stains found on the underside of the car were consistent with samples of the victim's hair and blood.

In contrast to the situation we faced in *Dyess*, in which an erroneous jury instruction so permeated the trial that we concluded there was not "any unpolluted or untainted evidence,"[27] here we find that the physical

[27] *See State v. Dyess*, 124 Wis. 2d 525, 546, 370 N.W.2d 222 (1985).

evidence admitted in error played a very minor part in the State's case and was largely cumulative in nature. When the evidence of the gun, bullets and keys is quantitatively assessed in the context of the whole, its admission does not undermine our confidence in the outcome of this trial.

After reviewing the overwhelming amount and force of the State's evidence, we are convinced that there is no reasonable possibility that the error in admission of those three items contributed to Harris's conviction. Therefore, we affirm the entry of the judgment of guilt.

*By the Court.*—The decision of the court of appeals is affirmed.

ROLAND B. DAY, C.J. (*concurring*). I concur in the mandate of the majority opinion, and agree that if the "fruits" of the *Edwards*[1] violation were erroneously admitted into evidence, such admission was harmless. However, I write separately because I disagree with the majority's conclusion that any fruits of an *Edwards* violation are inadmissible. I recognize that other courts in some jurisdictions noted by the majority opinion disagree. The court of appeals and the circuit court in this case, like some of the courts from other jurisdictions discussed below, have held that evidence derived from a suspect's voluntary statement, given after police questioning in violation of *Edwards*, is admissible. I agree.

The majority attempts to distinguish *Michigan v. Tucker*, 417 U.S. 433, 435 (1974), *Oregon v. Elstad*, 470 U.S. 298 (1985), *United States v. Sangineto-Miranda*,

---

[1] *See Edwards v. Arizona*, 451 U.S. 477 (1981).

859 F.2d 1501 (6th Cir. 1988), and *United States v. Cherry*, 794 F.2d 201 (5th Cir. 1986), *cert. denied*, 479 U.S. 1056 (1987), *see* majority op. at 240-51, but the factual differences the majority observes cannot obscure the simple result of this line of cases, culminating in *Cherry*: the fruits of a voluntary statement made after an *Edwards* violation are admissible, just as, under *Tucker* and *Elstad*, the fruits of a *Miranda* violation are admissible when there is only a violation of the *Miranda* prophylactic rule, and not of the suspect's constitutional rights. *See Cherry*, 794 F.2d at 208 n.6 ("[D]ifferent interests prevail when we evaluate derivative evidence obtained through the exploitation of statements obtained in violation of Miranda and Edwards but which, nevertheless, were voluntary."); *see also Wilson v. Zant*, 290 S.E.2d 442, 448 (Ga. 1982), *cert. denied*, 459 U.S. 1092 (1982) ("[T]he exclusionary rule does not apply to evidence derived from a voluntary statement obtained in violation of *Edwards v. Arizona* . . . ."); *State v. May*, 434 S.E.2d. 180, 182 (N.C. 1993), *cert. denied*, 114 S. Ct. 1310 (1994). The reasoning of the majority, that the violation here was of Harris's constitutional rights and not merely of the prohibition against interrogation from *Edwards, see* majority op. at 247-48, was rightly rejected by the courts that have reached a contrary result. *See, e.g., May*, 434 S.E.2d at 182 (noting that violation at issue was of "the prophylactic rule of *Miranda* as extended by *Edwards*," but not of a constitutional right). *Edwards* presented a prophylactic rule plainly violated in this case, but just as plainly Harris's statement was voluntary. The statement is rightly suppressed, but to suppress the evidence derived from a voluntary statement unnecessarily extends *Edwards'* "second layer of prophylaxis," *McNeil v. Wisconsin*, 501 U.S. 171, 176

(1991), to a much broader protection than it need be, or should be. *Cherry, Wilson,* and *May,* in my opinion, are better reasoned, and result in a rule more in keeping with sound public policy while protecting defendants from having inculpatory statements or admissions used against them. As the North Carolina Supreme Court stated in *May*:

> In *Tucker* and *Elstad,* the United States Supreme Court emphasized that determining whether evidence discovered as the result of a *Miranda* violation should be admitted depends on whether its exclusion would serve to deter improper police conduct . . . . It is important that all relevant evidence be submitted to the jury in order for it to make the proper findings. This outweighs the need to exclude evidence which was gathered as the result of a non-coercive statement made in violation of the prophylactic rule of *Miranda* as extended by *Edwards.* The deterrent value of the rule is satisfied by the exclusion of the statement made as a result of the *Miranda* or *Edwards* violations.

*May,* 434 S.E.2d at 613.

The United States Supreme Court has not ruled on the issue before us as to the effect of *Edwards* on the fruits of voluntary statements made following a request for counsel. Until such time as the Supreme Court rules otherwise, I believe we should follow the reasoning of *Cherry, Wilson,* and *May.* I would hold that the weapon and other physical evidence were properly admitted in this case.

For the reasons here stated, I concur.

I am authorized to state that Justice DONALD W. STEINMETZ and Justice JON P. WILCOX join this opinion.

SHIRLEY S. ABRAHAMSON, J. (*concurring*). The court's opinion correctly states the applicable federal constitutional law and I therefore join it. I write separately to emphasize my concern that we have embraced the United States Supreme Court's recent departure from its longstanding harmless error test without having had an adequate opportunity to consider whether Wisconsin should follow suit or, alternatively, retain our adherence to the standard enunciated by the Court in *Chapman v. California*, 386 U.S. 18, 23 (1967) and adopted by this court in *State v. Dyess*, 124 Wis. 2d 525, 370 N.W.2d 222 (1985).

As the opinion correctly observes, *Chapman* had warned that some constitutional rights are "so basic to a fair trial that their infraction can never be treated as harmless error," citing as examples the use of a coerced confession, the right to an impartial judge and the right to counsel. *Chapman*, 386 U.S. at 23. In clarifying the application of harmless error analysis in Wisconsin, the *Dyess* court referred to this caveat in *Chapman* and cautioned that the violation of constitutional rights comparable to the three rights enumerated in *Chapman* renders a harmless error analysis inapplicable and "automatically results in reversal." *Dyess*, 124 Wis. 2d at 543 n.10. *Dyess* also drew support for its adoption of the *Chapman* standard from Wisconsin's harmless error statute, Wis. Stat. § 805.18 (1993-94). *Dyess*, 124 Wis. 2d at 547.

As the opinion explains, in the subsequent United States Supreme Court decision of *Arizona v. Fulminante*, 499 U.S. 279 (1991), a narrowly divided (5-4) Court effectively overruled this language in *Chapman*. This change of direction in federal constitutional jurisprudence created a tension between the *Chapman*

standard which we had adopted in *Dyess* and the new federal standard articulated in *Fulminante*.

At least one and arguably two of the rights enumerated in *Chapman* and *Dyess*—the right to counsel and the right to a voluntary confession—are implicated in this case. The defendant's counsel did not address the tension between *Dyess* and *Fulminante* or the prospect that an application of harmless error analysis under the Wisconsin Constitution, *Dyess*, and Wis. Stat. § 805.18 might afford defendants more protection than does the federal constitution. Had counsel done so, the court would have been in a position to assess more fully whether it should adopt the new harmless error standard announced in *Fulminante* in lieu of this court's *Dyess* standard. Because the state law issues were not briefed, however, I do not comment on their merits. *See State v. Pitsch*, 124 Wis. 2d 628, 646, 369 N.W.2d 711 (1985).

For the reasons set forth, I join the opinion.